IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2024 Session

**STATE OF TENNESSEE v. RICHARD FAULK**

**Appeal from the Circuit Court for Maury County**
**No. 27055     Christopher V. Sockwell, Chancellor**

_____

**No. M2023-01218-CCA-R3-CD**

_____

A Maury County jury convicted the Defendant, Richard Faulk, of aggravated vehicular homicide, and he was subsequently sentenced to twenty years' imprisonment. In this direct appeal, the Defendant argues the trial court erred in (1) allowing two Tennessee State Troopers who were certified as experts in accident reconstruction to testify as experts in occupant kinetics and (2) allowing the State to introduce a copy of the Defendant's Tennessee Department of Safety driving record as evidence of his prior convictions when a copy of the driving record was not provided to the Defendant at the arraignment as required by Tennessee Code Annotated § 55-10-405(d). The Defendant also argues that the evidence is insufficient to support his conviction. Discerning no reversible error, we affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined

Jake Hubbell, Columbia, Tennessee, for the appellant, Richard Faulk.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Brent Cooper, District Attorney General; and Victoria Haywood, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction stems from a multi-vehicle head-on collision in which he was one of two occupants in a vehicle driving in the wrong lane against oncoming traffic. The other occupant, Rita Pitt, the victim-decedent, was ejected from the vehicle

and died.  Subsequent testing revealed that the Defendant's blood alcohol concentration was 0.227, or more than twice the legal limit in Tennessee.  The primary issue in dispute at the Defendant's three-day trial was the identity of the driver.

Carol Roberts testified that the victim-decedent, Rita Pitt, age 48 at the time of her death, was her biological niece.  On April 9, 2018, the day of the accident, the victim-decedent left their home with a man Roberts later identified as the Defendant.  Roberts recalled that earlier that morning, she had been sitting at the table talking with the victim-decedent, and the Defendant was with them drinking a beer.  He drank the beer and left the home but soon returned with a whiskey bottle.  Roberts asked the Defendant not to drink alcohol in her house.  Roberts said the victim-decedent and the Defendant went on the front porch for about 30 minutes, left in "some kind of Toyota," and that the Defendant was driving.  On cross-examination, Roberts said the victim-decedent was not drinking that morning.  She clarified that the Defendant left her home, went to the store, and bought the whiskey about 10 o'clock that morning.  Based on a photograph previously shown to Roberts, she agreed the photograph was taken when the victim was younger.  She denied that the victim had gained weight after the photograph had been taken and stated that the victim had "always been kindly heavy."  She agreed the victim was "heavier" when she died than shown in the photograph.

Patrick Davis testified that he was employed at Domino's Pizza on the day of the offense.  He came to work and "just saw somebody parked behind Domino's."  He said the vehicle was "like a truck" or a "4Runner, tan."  He saw people inside the truck.  He got to work around 10 o'clock that morning, and the vehicle was parked in the back of the Domino's until 11 o'clock.  He described how the vehicle left as "between Domino's and the storage center, turned left on Lyon Parkway, and then just onto James Campbell.  It was like one fatal swoop."  When the vehicle was on James Campbell, it was in the left lane or traveling in the wrong direction of traffic.  He further observed that the vehicle was "in a hurry" and "going faster than they should have been going for that area."  He agreed there was a stop sign in that area for which the vehicle did not yield.  After the accident, Davis observed "like alcohol or beer bottles" in the back of the Domino's where the vehicle had been parked.  On cross-examination, Davis agreed that he arrived at work around 10 o'clock that morning; however, he was unsure if the vehicle was parked in the back of the Domino's at "exactly" 10 o'clock.  He agreed it was not long after he arrived at work that he noticed the vehicle behind the Domino's.  He agreed he could not identify who was driving the vehicle when it left the Domino's parking lot.  He also agreed he could not identify whether the driver was a male or female.  Although he could not recall whether the bottle in the parking lot was alcohol or beer, he said he went out and saw the bottle in the area "like right after the accident" and before an officer recovered it.  He did not observe anyone drinking in the vehicle.  He agreed that people sometimes would "park" and "hang out" in the area behind the Domino's.

Three members of the National Guard Armory, Randy Cole, Robert Meigs, and Joshua Strickland,[1] were in a four-door Dodge and were eyewitnesses to the head-on collision on April 9, 2018. Cole, the front seat passenger, testified they were in the James Campbell Boulevard and Hampshire Pike area and witnessed the accident. He said a silver Toyota 4Runner "pulled out into the wrong side of the road and started traveling at a high rate of speed." Cole dialed 911 and told Strickland, the driver, to speed up because the 4Runner was "going into a major intersection where the red light is . . . and [he] knew it was going to be bad." Cole testified regarding how the crash occurred:

> The 4Runner veered off into the median, overcorrected back into the highway, and hit probably four cars head-on. And the 4Runner spun, I'd say, a 180 because the front end was pointed the other direction, and a woman was ejected out of the vehicle probably 12 [feet] in the air.

Cole said the speed limit in that area was 45 miles per hour, and he knew the 4Runner was speeding because they had to accelerate to reach the crash scene to render aid. Cole continued to describe the motion of the 4Runner at the time of the crash as follows: "It went into the median and come back in, hit head-on with one of the vehicles, and just done a -- it might have been a 360. But either way, it was sitting long way in the highway." He said, "the woman was ten [feet] from the car on the highway." He agreed that the 4Runner "spun to its left." Another crash victim from a Jeep assisted them in rendering aid. Cole said, "the man in the 4Runner was pinned up against the passenger door between the glove box and the window." Asked specifically where the man's head was positioned, Cole said, "up between the glove box and the passenger window." Asked where the man's feet were positioned, Cole said, "[g]oing back toward the driver's seat into the console." Cole described the man in the 4Runner as "an older man," but he did not get a "good look" at him because he left to render aid to another crash victim. He was unable to identify the Defendant in court. Cole and the other men in his vehicle aided the victims until first responders arrived. Cole said the crash scene was "chaotic" and described the condition of the 4Runner as "horrible" and "totaled."

On cross-examination, Cole agreed he could not identify who was driving the 4Runner. He agreed that the crash occurred within "a matter of seconds . . . . one minute." He explained that they were behind the 4Runner, traveling in the right lane while the 4Runner was "going against traffic." When the 4Runner struck the other vehicle, Cole had already called 911 and pulled off the road. He agreed he was "probably first" to arrive at the crash scene. Cole clarified the man's position in the 4Runner and said, "He was in the passenger seat. His head—if you could lay him down like this, his feet [were] across the

---

[1] Strickland did not testify at trial.

passenger seat and into the console." Cole approached from the passenger side door, which was closed. He did not open the door or render aid because another first responder was there and asked him to check on the "woman in the truck." Cole further clarified that the man's legs were "laying over the console in the middle" of the 4Runner. Upon further cross-examination, Cole explained that the man's feet were "on top" of the console; however, "the fireman may have moved them." Cole said a firefighter who was involved with the crash was at the 4Runner before he observed the man inside.

On redirect examination, Cole demonstrated and clarified his prior testimony regarding the position of the 4Runner after it came to rest. Cole said the front end of the 4Runner was toward the median and the grass of the highway, and the woman's body was "back toward the direction in which they were traveling."

Robert Meigs, the backseat passenger in the Dodge, testified consistently with the testimony of Cole as to the events leading up to the head-on collision. However, Meigs said, "As soon as [the 4Runner] hit the vehicle head-on, the rear end of the vehicle went up in the air. As it spun, the female was thrown from the driver's side window. She come up, she went about 15 feet in the air[] and come down on her head and her left shoulder[.]" He believed the 4Runner spun clockwise. He rendered aid to the female until first responders arrived. Although the female was unconscious and nonresponsive, she opened her eyes and mouthed something to Meigs, but he was unable to make out what she said. Regarding the position of the man in the 4Runner, Meigs recalled, "the male was sitting on the passenger side, and he was unconscious, also, and his feet [were] up against the – like kind of where the transmission is of the vehicle."

On cross-examination, Meigs maintained that the female was ejected from the driver's side of the 4Runner. He further confirmed that he provided the same information in his statements to law enforcement on the day of the crash. He agreed that he was one of the first to respond to the scene, that the male was in the passenger seat, and that his feet were within the passenger floorboard, not the driver's floorboard. He agreed the male was not "laying across the driver's seat." He agreed the male was sitting in the passenger seat with his feet in the passenger floorboard with his body "slumped" toward the center console. He agreed that the firefighter involved in the collision may have arrived at the 4Runner "just before" he did. Before the crash, he could not tell who was driving the 4Runner.

Shari Holt, another eyewitness to the head-on collision, testified that she was driving in the left lane on James Campbell Boulevard with her five-year-old daughter. She described an "SUV . . . on her side of the road coming toward [her.]" Once the vehicle approached her car, she was unable to react because it was "so fast." She said:

[H]e must have went beside me in the grass because -- but it was literally so fast. And the next thing I knew -- I looked in [the] rearview mirror at the exact same time that I heard crashing metal, and the car hit the truck behind me head[-]on just about. Like, it was -- it was like they went -- my car was here. They went like this and then just like slung into it. And when that happened, the -- it was almost immediate -- the passenger door slung open. There was a curly, blonde-headed woman that fell out like a rag doll, I mean, just... (Claps hands.) And I will never forget what I saw.

Holt said when the vehicle was coming toward her, their vehicles were facing each other, and the driver was facing the passenger. She testified that she could see two people, that a woman was in the passenger seat, and that she saw "her hair, like it was poofy . . . [and] wild[.]" She was "100% sure" that a man was in the driver's seat. She said, "[H]e was sitting like a man. He looked like a man. It wasn't no petite -- women usually sit a certain way; men just sit a certain way. I mean, I knew it was a man." She also observed the woman's shoe "still in the [passenger] floorboard when [she] got back to the scene."

On cross-examination, she emphasized that the driver was a man because he was not feminine, and his hair was cut short. She said the driver appeared to be larger than the passenger. She agreed she watched the crash through the rear-view mirror of her minivan and that it was quick. However, she could still see it because she had a "photographic memory." After the impact, she was certain the passenger door opened, and the woman "flopped out" "headfirst to the pavement." Holt insisted that she did not swerve as the 4Runner was coming toward her; however, she agreed she provided a statement to law enforcement saying that she did swerve to avoid being hit. She maintained that she would have "took out" the vehicle next to her if she had swerved. After defense counsel refreshed her recollection, she agreed that she was in shock and confused when she returned to the scene after the collision. On redirect examination, Holt testified that she was certain that the man was in the driver's seat and the woman was in the passenger seat of the 4Runner.

Rachel Ann Sparkman was driving a Nissan Titan heading home when she was involved in the head-on collision. She explained that amphetamine was found in her blood after the collision because she was taking 30 milligrams of Adderall twice a day at the time. She had been prescribed the medication by her doctor and had been taking it for six or seven years. She also agreed that THC or marijuana was found in her blood; however, she said it was because the weekend before the collision she smoked and drank to celebrate her husband's birthday. She denied that either of these substances affected her ability to drive on the day of the collision, and she was not criminally charged in connection to the collision. She did not remember "a whole lot" about the day of the collision. She went to her husband's work, stopped at the red light, and proceeded through the green light. She remembered waking up when "they were doing CPR on the lady" but she "was back out

of it" until her husband arrived at the scene. She was taken to the hospital and treated for a punctured lung and three broken ribs.

Jonathan Hardy, an on-duty firefighter, was driving his Jeep Wrangler and headed to Columbia Fire Station II on the day of the head-on collision. As he pulled through the intersection, a red pickup truck was next to him. He then observed a 4Runner approaching in the opposite direction and striking the median and the vehicle next to him. When the 4Runner struck that vehicle, it spun the vehicle around. Hardy said, "the lady was ejected out of the vehicle. Her truck hit my Jeep and went into the ditch." Asked if he remembered which side "[the victim-decedent], the female flew out of," Hardy said she came out of the front passenger window. He exited his vehicle and observed the man in the 4Runner "laying across the center console with his feet towards the steering wheel. And [the woman] was on the ground." Hardy observed the woman's head was pointed toward the front tire of the passenger side of the 4Runner. He initiated CPR on the male until someone else took over. He said there was damage to the front passenger side of the 4Runner, and the front passenger window was "busted out." None of the other windows that he could remember were broken.

On cross-examination, he affirmed that the female was ejected from the passenger side window. He said the door did not come open, and the female went through the window. He said the vehicle next to him was a Nissan Titan, and he was "behind and to the right of" the Nissan Titan. The impact was to his left. The Titan was on the roadway when the female was ejected. Hardy approached from the passenger side when he was rendering aid to the male inside the 4Runner. He said the door could not be opened and rendered aid through the window. He said he could reach the male in the 4Runner due to his position, which Hardy described as follows: "His head [being] towards the passenger door. His feet were underneath the steering wheel." Hardy denied that his head was towards the glove box in the passenger compartment and said it was towards the door. Hardy and some men from the National Guard were among the first to arrive at the scene.

Lieutenant Orlando Cox of the Columbia Police Department testified that he investigated the head-on collision in the instant case and took photographs of the scene. The photographs were of the crash scene with the emergency personnel and the vehicles, the vehicles involved in the collision, markings taken by the Tennessee Highway Patrol (THP) of the route/movement of the 4Runner, a bag with an object inside, a white tennis style shoe in the floorboard of the 4Runner, a patrolman holding a bag with an alcoholic beverage, a prescription bottle with name, and a photo of the victim-decedent at the hospital. On cross-examination, Lieutenant Cox confirmed that other personnel were on the scene before his arrival, and he did not know his arrival time. There was no one inside the 4Runner when he arrived. The photograph of the brown paper bag with alcohol inside was found on the driver's side of the 4Runner. He agreed that other photographs reflected

debris found on or around the passenger's side. Asked if the bottle was found in the location when the photograph was taken, he said, "I would assume so, yes, sir." Regarding exhibit 13, the photograph of a boot in the passenger seat, a medical personnel glove, and some items on the passenger floorboard, Lieutenant Cox could not recall the order in which he took these photographs. In contrast, in exhibit 14, a photograph of "Strawberrita"/alcohol, there was no boot in the passenger seat, and there were no visible items on the floorboard in the photograph. He denied that the items were moved at some point in the photographing process. He could not explain why one photograph showed the boot and medical personnel glove in the passenger seat and the other photograph did not show them visible.

Officer Michael Barnick of the Division of Columbia Public Works testified that at the time of the head-on collision, he had been a patrol officer for the Columbia Police Department (CPD) for seventeen years. He participated in investigating the instant offense and was one of the first officers to respond to the scene. Upon his arrival, military personnel tended to the victim-decedent on the vehicle's exterior on the passenger side. He said the victim-decedent was lying in the roadway. He further observed Hardy on the scene, and Lieutenant Cox arrived later. He opined that it was midafternoon when he arrived, and the crash scene was in front of Fresenius on South James Campbell, a hundred yards south of the intersection at Hampshire Pike. A Nissan pickup truck that was also involved in the accident was in the left lane, the fast lane of James Campbell Boulevard. The 4Runner was in front of the Nissan but facing or between the Fresenius and the Fast Stop at the intersection. The 4Runner had heavy damage on the passenger's front corner, and the Nissan had heavy damage on the front end. The passenger front door of the 4Runner "looked as if somebody had grabbed the top corner of the door and pried it away" from the vehicle's frame. The body of the victim-decedent was on the scene when he arrived and positioned "15ish to 25ish feet . . . just outside of the passenger side of the vehicle." He described the position of the male as

> in the driver's side of the vehicle. His feet were as such as if he could operate the pedals just as I am sitting right here. Everything short of him holding the steering wheel, if you would have just taken and dropped his hands down, he was leaned over on the center console, but his rear end was in the driver's seat and his feet were in that floorboard.

Officer Barnick demonstrated the position of the man's head toward the passenger's seat for the jury. He identified the Defendant as the male he observed inside the 4Runner. In the passenger side floorboard, Officer Barnick observed a shoe that was later connected to the victim-decedent. He responded to the emergency room to check the condition of the victim-decedent and observed that she was still wearing the matching shoe found on the vehicle's passenger floorboard. He confirmed the white shoe shown in the

photograph in exhibit 13 was identical to the shoe worn by the victim-decedent. He said that under CPD policy, a patrol officer would not be permitted to move such evidence.

On cross-examination, Officer Barnick confirmed that several other people were on the scene before his arrival. He denied removing the Defendant from the 4Runner and said he waited for emergency personnel to arrive. Based on the large group of people at the driver's side of the 4Runner, Officer Barnick claimed the Defendant was removed from the driver's side. He maintained that the Defendant was seated in the driver's seat leaning on the center console. On redirect examination, Barnick said the owner of the 4Runner was the Defendant.

Sergeant Trent Thomson of the Columbia Police Department (CPD) testified that he participated in identifying the female at the crash scene of the head-on collision in this case. Because her cell phone was broken, he established her identity through the SIM card. He also obtained a search warrant for the Defendant's blood drawn at the hospital, sent the autopsy request, and received the Tennessee Highway Patrol Critical Incident Response Team (CIRT) report. Sergeant Thomson said the Defendant's blood was sent to the Tennessee Bureau of Investigation (TBI) for testing. Sergeant Thomson spoke with the Defendant twice in recorded phone calls. The Defendant initiated each phone call and provided lengthy explanations about the circumstances leading to the crash. Before playing the audio recording of the call for the jury, the State asked if Sergeant Thomson "employ[ed] any tactics in speaking with the Defendant." Sergeant Thomson explained that he may "throw out misinformation" to gauge "deceptive indicators" to determine if a person is being truthful. When he spoke with the Defendant, Sergeant Thomson "hit him with information to get [him] to come with little tidbits of information back to [him]."

When the State began to play the audio recording of the Defendant's first phone call to Sergeant Thomson, defense counsel objected to statements Sergeant Thomson made during the call placing the Defendant in the driver's seat and the victim in the passenger seat. Defense counsel reminded the court that his prior motion sought to exclude this testimony based on Sergeant Thomson's status as a lay witness. In response, the State argued that Sergeant Thomson's prior testimony established that he was "using tactics to elicit a reaction." During testimony taken outside the presence of the jury, Sergeant Thomson testified regarding his comments to the Defendant that (1) "I am trying to figure out what happened because here is the crux of it, man, you were driving on the wrong side of the road, and because of you driving on the wrong side of the road there is a woman dead now;" and (2) "She was flung out the passenger side and you were flung to the passenger seat." Sergeant Thomson said these comments were "representative of my opinion, but they were tactics to put pressure on as well. So[,] I guess that's where the question lies, because it definitely is a tactic, but that's through my investigation, the reports, and looking at the pictures and everything like that." The trial court determined

Sergeant Thomson could testify regarding "tactics;" however, the court also stated, "I'm not going to let him get into his opinion." Defense counsel lodged a continuing objection to the remaining portion of the audio recording, and the trial court instructed the jury regarding Sergeant Thomson's testimony.

Following the bench conference, the State resumed the testimony of Sergeant Thomson. At the top of his testimony, he clarified that some of his statements during both audio recordings were intended to be tactics to put pressure on the Defendant. As an example of one tactic, Sergeant Thomson said there was video from Domino's to get a reaction from the Defendant when, in fact, there was no surveillance video from Domino's. A recording of each phone call was then played for the jury. In the first call on April 19, 2018, the Defendant called Sergeant Thomson from the hospital and said he did not remember anything from the time he fell asleep the night before to the time he woke up in the hospital. The Defendant asked Sergeant Thomson if any charges were being filed, and after some questioning, the Defendant said that he went to the victim-decedent's home the day before the crash and spent the night. He did not remember anything else about the crash except an officer helping him out of the vehicle.

Eleven days later, on April 30, 2018, the Defendant called Sergeant Thomson again and told him he had read the police report and that it was wrong. The Defendant said he was not driving the 4Runner at the time of the crash and explained that the first time he called Sergeant Thomson, he was under a "medication fog." The Defendant admitted that he drove to the Domino's on the morning of the offense. He said he pulled into the parking lot and that he could not drive because he had drunk alcohol the night before. He said the victim-decedent insisted that she had to be somewhere, so he gave the victim-decedent the keys because she was not inebriated. He denied driving from the Domino's parking lot and claimed that the victim-decedent drove from the parking lot. He also denied that the victim-decedent was ejected from the vehicle. He claimed the victim-decedent jumped out of the driver's side of the vehicle while it was still rolling. The Defendant claimed he unbuckled his seatbelt and attempted to stop the vehicle by putting it in park.

Sergeant Thomson testified that at the time of the collision, CPD did not have a policy to retain vehicles involved in fatal accidents. Although CPD did not retain the 4Runner, it had access to it. A year after the collision, Sergeant Thomson accessed the 4Runner and retrieved a left shoe from the passenger side floorboard, which was admitted as an exhibit. The shoe was consistent with the shoe in the photograph from the crash scene, and it was retrieved from the same location.

On cross-examination, Sergeant Thomson agreed that he had waited over a year to retrieve the shoe from the 4Runner and that the 4Runner was no longer in the custody or control of the CPD. He agreed that his interview tactics involved telling interviewees lies

to get a reaction. He also agreed that he was dishonest with the Defendant throughout his phone interview, including when he told him, "You were driving on the wrong side of the road" and "You drove the car." He agreed that the Defendant "did not waiver" that he was not driving when he told him there was a video from Domino's and that the Defendant was "steadfast" that he was not driving the car. Sergeant Thomson further agreed that he told the Defendant three people followed beside him while he was driving on the opposite side of the road. Sergeant Thomson said that before the Defendant's phone interview, Sergeant Thomson knew that one of the witnesses had stated that "the driver was ejected." Finally, Sergeant Thomson agreed that he did not follow up or interview any other witnesses.

April Bramlage, a special agent and forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in forensic toxicology. She received a blood sample from the Defendant and determined that it contained 0.227 grams of ethyl alcohol. The blood alcohol report memorializing her findings was admitted as an exhibit at trial. Joseph Castelbuono, a toxicologist with the TBI, testified as an expert in forensic toxicology. Special Agent Castelbuono analyzed the Defendant's blood sample and determined that it contained 49 nanograms per milliliter of midazolam and sertraline, better known as Zoloft. His report was also admitted as an exhibit. On cross-examination, Agent Castelbuono agreed that it was not uncommon for blood to contain midazolam when it is drawn from a hospital because it is associated with pain relief.

Trooper Jamison Benefield testified at trial consistently with the testimony provided during voir dire regarding his background and training, and he was declared an expert in accident "crash" reconstruction. Trooper Benefield testified that he and Trooper Sanders of the CIRT responded to the instant fatal crash at the request of the CPD. He initially photographed the scene and conducted forensic mapping of the scene and the evidence. Upon arrival, Trooper Benefield observed "tire marks that were leading off going into the grass median, which is to the right." By way of demonstration with a toy car for the jury, Trooper Benefield said he noticed "yaw marks," which meant that a vehicle was starting to rotate or had rotated. He further advised, "[W]henever a vehicle is in a yaw, it's just saying that the rear wheels are tracking outside the front." Trooper Benefield further demonstrated and described the interaction of the vehicles involved in the crash.

Several photographs depicting Trooper Benefield's characterization of the crash were also admitted into evidence. Asked about the "forces that are involved in all of this and how those forces act upon these vehicles," Trooper Benefield explained that accident reconstruction relies on Newton's laws. He explained "inertia" and compared it to the feeling of riding in a car that suddenly stops, but the body "wants to continue[at] the speed its going[.]" He said the phrase "a crash happens within the blink of an eye" is derived from data that most crashes happen within 140 milliseconds or less, which results in "delta-v" or "a change in velocity" for the body inside the vehicle. Asked to explain further, "how

you get from that stopping and being pushed forward into how they moved from there," Trooper Benefield replied as follows:

> So if you think about the Toyota 4Runner, it's coming in at an angle, right. So it's kind of – it's not necessarily going, you know, exactly 180 degrees opposite of the oncoming traffic. It's more, you know, kind of angled, if you see what I'm saying, because he's off the roadway coming back on and, you know, kind of going at an angle, right.

> So as the Nissan comes along and they're making contact -- well, let's just say this vehicle was doing 50 miles an hour, right. So all of a sudden, it slows down to 25. But the bodies inside, if they're unrestrained, they're going to continue on. See what I'm saying?

> So as they come together, this vehicle is being stopped, the bodies are continuing. You know, so let's say this right here is the passenger, right. So the bodies are kind of coming over.

> . . . .

> So if you can think about this vehicle, it's suddenly being rotated, you know, 25 miles an hour, 140 milliseconds, it's swoosh, coming around. So the bodies are coming up, it's coming around, and that passenger side door is -- you know, it's coming around as the bodies, you know, are being -- continuing on.

Based on his examination of the seatbelts in the 4Runner, Trooper Benefield stated that neither the driver nor the passenger in the 4Runner were restrained by seatbelts. He further observed that the top of the passenger side door was folded down and opined, based on his prior crash experience, that this was consistent with the passenger being ejected. In contrast, he said that the steering wheel and the center console would entangle the driver. Under these circumstances, he opined that it was "very unlikely" that someone would be ejected out of the driver's side. He further opined that it would be more likely for the passenger to be ejected from the passenger side of the vehicle than the driver to be ejected from the passenger side of the vehicle. Finally, he stated that it was "very unlikely" for the driver of the vehicle to be ejected out of the passenger side, but the passenger not to be ejected at all.

Several more photographs taken from the crash scene were admitted into evidence, including photographs of a paper bag with a bottle of Jack Daniels whiskey, the front passenger side of the 4Runner showing contact damage to the wheel as it canted, the top

of the front passenger side door, a Big Gulp plastic cup, the debris field, the post-impact path of the Nissan, and tire scuffs indicating contact. Trooper Benefield also observed a shoe in the passenger side floorboard.

On cross-examination, Trooper Benefield affirmed that upon his arrival at the crash scene, other CPD personnel were already present. He explained that he and Trooper Sanders worked together with CPD and that he was there to assist Trooper Sanders. He affirmed that he observed the shoe on the passenger side floorboard after he arrived. He did not recall observing a boot or a blue medical personnel glove in the passenger seat. He agreed that one of the photographs displayed the shoe in the front passenger seat, a boot, and a blue glove. He did not recall the boot or the glove being in the seat while he was at the scene. Upon being shown another photograph displaying a bottle of Jack Daniels, he agreed that it did not show the boot or the glove and was more consistent with the crash scene upon his arrival. He agreed that THP had a protocol for photographing scenes and tried not to move items and photographed them as they were found. He agreed that most of the debris he observed was found on the passenger side of the 4Runner. He said the "biggest thing" he observed on the driver's side was the whiskey bottle, as shown in exhibit 25.

Trooper Benefield agreed that he did not do any calculations to determine the speed of the 4Runner or any other vehicle in this case. He explained that the 25-mile-an-hour reduction in speed that he previously testified to was consistent with other crash cases he had previously worked on. He agreed that it was unlikely to calculate the speed of the 4Runner without an event data recorder (EDR) due to the third vehicle involved. He agreed that had the occupants in the 4Runner been wearing seatbelts, their bodies would have been restrained in the vehicle, which may have prevented ejection. Based on the angle and momentum of the 4Runner, Trooper Benefield said, "the passenger would have been going like towards the A-pillar," which was to the right of the front passenger side door where the windshield is connected to the frame and door of the vehicle.

Asked if it were possible that the passenger would be "lurched up towards the glove box and the A-pillar and not be ejected[,]" Trooper Benefield said, "I don't think so, not with the forces in this particular one." He did not think it was possible "at all" for the person to remain in the vehicle and further explained,

> . . . I feel like it would have to be more of a longitudinal type delta-v; in other words, from front to rear. You know, that's going to launch you to the glove compartment, right. But whenever you got that more of a lateral coming in, then it's going to be more angled.
>
> . . . .

- 12 -

If it would have been for – because the other thing is the spin on the vehicle, too.  So, you know, that's what I'm saying.  The person is up out of the seat, so the vehicle is spinning.  You know, all of this is occurring at the same time.  Right?

. . . .

So, you know, that's why I'm saying, had it just been that initial contact, then yea, the person could have just went into the A-pillar and been in the vehicle.  But I think whenever that spin happened . . . you're A-pillar is moving out of the way.  You know, the person is up; the vehicle is moving.  That's what you have to consider.  They're not moving together.

Trooper Benefield confirmed that upon his arrival, the passenger side door of the 4Runner was open.  Although he did not know if the passenger side door was open after the spin of the 4Runner, he did not believe it would change his analysis based on the way the passenger side door was folded down, which was consistent with "something entangled and pulling the top of the door out."  He did not know if the damage to the door happened after the crash by an external force, person, or equipment.  He agreed that the victim-decedent's body had been removed before he arrived at the scene.  He did not witness the location of the victim-decedent's body before removal; however, he recalled "two reddish-brown stains … consistent with blood there on the road."  He did not test those stains to confirm if they were blood; however, he believed Trooper Sanders advised him of the location of the victim-decedent's body.  He agreed that the victim-decedent's body was located "outside the passenger side of the car," that her body was the direction the vehicle had traveled from, and that her body was in the path of travel.  He did not locate any skin, hair, or blood on the passenger window frame, A-pillar, or anywhere in that area.  He agreed that he did not review any medical records for either of the occupants of the 4Runner during his investigation.  He agreed that the tool markings on the passenger door could have been consistent with someone having been extricated from a vehicle.  He denied that the condition of the passenger door upon his arrival and the forces exerted on the passenger door during the wreck could have been from the tool markings from the extraction.  He explained that there was a difference between tool markings and contact or induced damage, and he could "pick out the tool mark damage from the crash damage."  He nevertheless agreed there was a tool mark and crash damage on the passenger door of the 4Runner.

Trooper Benefield agreed that he did not witness the Defendant in the 4Runner upon his arrival at the crash scene, and Trooper Benefield did not know where the Defendant was found in the vehicle.  He did not take any witness statements as part of his

- 13 -

investigation. He said he did not do a "full reconstruction" in this case. He agreed that the victim's body was located "behind the impact" of the path of travel of the 4Runner. Although Trooper Benefield had experience with other crashes where the body was in the pre-impact path, he agreed that "more often than not," this situation did not happen.

Trooper Paul S. Sanders testified consistently at trial with his voir dire testimony concerning his education and background, and he was tendered as an expert in "crash reconstruction." As part of the CIRT, he was requested to assist the CPD in investigating the instant crash. He explained that he was requested because there was a possibility of felony charges and fatal crashes involving felony charges "is one of the big portions of what we do on the unit[.]" He was asked to photograph and document the crash scene by taking measurements using specialized equipment. He was also asked to examine the vehicles involved in the crash. He explained his initial observations upon arrival at the crash scene, aided by a photograph of the scene. He stated:

> When we arrived at the scene, it appeared to be a crash that had occurred -- the area of the crash was a two-lane roadway for both directions with a grassy median dividing both lanes of travel. There was a Toyota -- I mean a -- it was a 4Runner in the -- what we call the number one lane of travel, which if you're going down the highway, it would be the left lane. We start in the middle and work to the right, and they get bigger as you go. So the number one lane, there was an SUV. There was a red Jeep Wrangler -- it was either in the number two lane or on the shoulder of the roadway. There was a Nissan Titan off the right side of the roadway in kind of a grassy area. There was debris in the roadway. It appeared to be, just from initial observations, a pretty serious crash. With just initially walking up on it, I would have said it was a head-on angled type collision, initially, upon arrival.

He prepared a report of his investigation of the crash scene, which was admitted as evidence. Rather than a "true head[-]on collision," Trooper Sanders described the instant crash as a

> non[-]central collision, where the center of masses are offset so that you do have the rotation. . . . the majority of the damage sustained to the SUV would have been on the right side more so than the front, which would be an angular collision . . . [However,] the directions of force would still be similar to a head-on on collision[.]

A significant portion of Trooper Sanders' testimony was demonstrating with visual aids how the collision occurred. He explained that the collision had yaw characteristics in a counterclockwise manner and that there was visible evidence of crossover. As a result,

- 14 -

there was a "crossover with the tire marks on the roadway as opposed to if you slam on the brakes and come to a controlled stop." He said tire marks are "just straight laid on" and do not crossover. The collision also had perpendicular striations in the tire marks, which indicated the vehicle went into a sideslip.

After the initial impact, the SUV continued to rotate counterclockwise into a secondary slap, meaning two vehicles struck each other a second time during a crash. There was evidence on the passenger side above the taillight of the transfer of red paint from the Nissan Titan, which Trooper Sanders believed corroborated his conclusion of a secondary slap. Trooper Sanders also created a maximum engagement diagram, which was admitted into evidence. The maximum engagement diagram showed how the vehicles were engaged before separating and creating a damage profile, which also confirmed a secondary slap. Trooper Sanders provided additional demonstrations based on other diagrams that were admitted into evidence.

The State then asked, "Now, let's talk about this idea that [the victim-decedent] had been ejected from the vehicle. What evidence was there on scene to suggest that that was the case as opposed to her exiting the vehicle on her own?" Defense counsel objected and reminded the court of its prior ruling prohibiting the State from "talk[ing] about who was seated where and who was ejected from where[.]" During a bench conference, the court stated, "I don't have a problem with him giving facts that were presented to him. But if it gets into she was ejected from the passenger side, I think that's where it becomes problematic." The court later stated, "I think it's -- I think [Trooper Sanders] can testify to what the forces were on each seat."

The trial resumed, and the State asked Trooper Sanders to "tell [the jury] about the physical evidence on the 4Runner that supported an ejection theory of this case?" In response, Trooper Sanders stated:

> The biggest thing that would support the theory of an ejection would be the direction of force. We were talking about that when you get into the way it affects occupants in a vehicle, when we were talking about the direction of force coming in from the right front of the vehicle through the vehicle.
>
> The way that it works with objects, people, anything in the vehicle is based off Isaac Newton's first law of motion, law of inertia: An object in motion will remain in motion; an object at rest will remain at rest until acted upon by an outside force. Even though the vehicle is taking that impact, the occupants, anything involved in the crash, hasn't yet. That's going to want to keep traveling in that direction.

- 15 -

When you look at the principal direction of force and that maximum engagement we looked at, the opposite of that would be consistent with an occupant in the passenger side having the opportunity, if you go against the direction of force, to go out the passenger side window.

Trooper Sanders testified that the physical evidence supporting his ejection theory included the damage to the passenger side front door. Asked the likelihood of the driver being ejected out of the passenger side, Trooper Sanders said:

If you go -- once again, going back to the laws of inertia, the driver's direction is going to be angled more so into the windshield than if -- if we're sitting in this vehicle and we take force from this angle, if I go opposite of that, I can go out this window. It's going to be extremely difficult for somebody here to go out that window because they're also going to have the center console, the dash, the windshield, and that front A-pillar obstructing them when the direction of force is in that direction; whereas, in the passenger seat, there's not as many obstacles to get out that window and be ejected.

Asked "the likelihood that the person in the driver's seat could be ejected out of the driver's side?" Trooper Sanders said, "As close to 0 percent as I could give you." He explained:

When that vehicle is rotating counter-clockwise, force is going to go away from the center. If you take that vehicle and put it on a top and spin it counter-clockwise, all the force is going to push away from the center towards the passenger side of the vehicle. If you're rotating clockwise, it's going to push you to the driver's side of the vehicle. Looking at the maximum engagement and the post-impact travel for the 4Runner, all rotation was counter-clockwise, which is going to push away from center towards the passenger side. Physically, it's all but impossible for a driver to be ejected outside of the driver's side window.

A portion of Trooper Sanders' report on his examination of the 4Runner was admitted into evidence. He stated that the 4Runner was in drive when it came to rest. He said there was no physical evidence consistent with seat belt usage in each of the front seats.

On cross-examination, Trooper Sanders agreed that he attended college for two semesters and did not have a college degree. He agreed that all his training in physics has

- 16 -

been through the Tennessee Highway Patrol crash reconstruction classes and that he has only testified as an expert twice before the instant case. He acknowledged that the vehicle had been towed from the crash scene before he examined it. He agreed that he did not know everything the wrecker service did to the vehicle before he examined it. He agreed that he did not do a "report of findings" or "full reconstruction" in this case because it was not requested. He agreed that neither vehicle occupant was on the scene upon his arrival. He did not interview any witnesses in this case or consider any witness statements from the scene as part of his analysis. He agreed that he had not communicated with the CPD officers on the scene during his investigation and reconstruction analysis before his arrival. He said he communicated with the CPD officers while on the scene. He agreed that he did not know what CPD officers or emergency personnel did before his arrival on the scene. He did not review any medical records in this case. He explained "delta v," but agreed that he did not conduct a "delta v" examination. He did not measure the size of the passenger window or consider the height and weight of the occupants.

Trooper Sanders denied that the debris field was "back the direction of the 4Runner" and explained that "the debris was not where the 4Runner came from." Upon being shown photographs, Trooper Sanders stated there were two separate debris fields: the Nissan and the Toyota. He agreed that he did not document "what debris came from what vehicle at the scene." He agreed that it was possible for "one piece of debris" to come into a debris field. While every crash is different, Trooper Sanders agreed that it was also possible that debris from the vehicle would have landed north of the vehicle, post-impact rotation. He explained, "when you've got post-impact rotation at 270 degrees, something can be slung out the window at any point during that 270 degrees." He was personally familiar with the location of the victim-decedent's body and based his diagram on "two spots" of blood the CPD believed her body was lying. He observed the "spots," but did not know if testing was performed to confirm the substance. He said one of the "spots" was "almost touching one of the tire marks." Asked how many accidents he had seen where a person was ejected and their body was located behind the point of impact, Trooper Sanders responded, "I have seen it. I wouldn't be able to give you a number. I'd say at least a half -- six times, seven times, just trying to ball park it in my head." He agreed that "more often than not," in ejection cases, the body lands in front of the point of impact. He did not calculate the speed either of the vehicles was going at the time of impact. Trooper Sanders agreed that upon impact, the 4Runner "dipped towards the passenger side" meaning that the passenger side would have tilted slightly and rotated toward the Nissan Titan.

David Zimmerman, the medical examiner who performed the victim-decedent's autopsy, testified regarding his report, which was admitted as an exhibit at trial. Several photographs of her injuries were documented during the autopsy and admitted as exhibits. The photographs showed her left upper arm and shoulder with abrasions and contusions. Her left chest, the left side of the back, and abdomen showed abrasions, contusions, and a

laceration. The cause of the victim-decedent's death was "lacerations, or tears, of the internal organs. There were fractures, or broken bones, in the spine, the arms, the ribs, and the sternum. There was associated hemorrhage, or bleeding." There was also a laceration of the aorta, liver, spleen, lungs, and the pericardial sac. Dr. Zimmerman said the victim-decedent weighed 248 pounds at the time of her death and was wearing one white shoe when she arrived at his office.

On cross-examination, Dr. Zimmerman agreed that the victim-decedent suffered "significant" injuries to both sides of her body, including fractured ribs. He agreed that his report reflected "unknown" regarding whether the victim-decedent was the driver or passenger. He agreed that she died of blunt traumatic injuries and that she died of an accident. He said the victim-decedent was 5 feet 9 inches tall. The toxicology report of the victim's blood showed the presence of ethanol in her chest and eyes, which reflected a blood alcohol concentration level closest to an hour before the victim's death of 0.056 in her chest and 62 milligrams per deciliter in her eyes. He agreed his report showed the victim with "gray scalp hair."

The State rested, and the Defendant elected not to offer proof. Based on the above evidence, the jury convicted the Defendant of vehicular homicide, and following a brief hearing, the second phase of the trial commenced.

Trent Thomson testified that the Defendant was born on June 2, 1964. The State admitted a certified copy of the Defendant's driving history from the Tennessee Department of Safety as a self-authenticating document. The top of the driving history included the Defendant's identifying information, including his name, race, date of birth, weight, height, and "non-cdl" status suspended. The document is formatted with six columns for event date, action date, action code, location, date received, speed mph/zone, case number, and document control number. Under each column, corresponding information included DUI's in 1998, 1987, and 1986. The report did not reflect whether the Defendant was convicted of DUI. Defense counsel renewed his objection, which was overruled.

On cross-examination, Thomson agreed that he had not reviewed "this specific document." Upon his review, he agreed that he was familiar with the "charges" listed in the document. He agreed the document "purports to show some prior DUI's[.]" He explained that he had reviewed a "similar driving history [of the Defendant's,] but it was not certified." Although Thompson knew the Defendant had prior convictions, Thomson did not know the dates of the convictions and had not been involved with those cases. He agreed the cases were outside Maury County. He did not know how to interpret the exhibit the State admitted into evidence as the Defendant's driver's history, and he agreed that he could not determine if the Defendant had prior convictions from the document.

After the second phase of the bifurcated trial, the jury found the Defendant guilty and enhanced his conviction to aggravated vehicular homicide, a Class A felony. The trial court later sentenced the Defendant to twenty years' imprisonment. This case is now properly before this court for review.

## ANALYSIS

**1. Admissibility of Expert Testimony.** At issue here is whether the troopers who testified as accident reconstruction experts in this case were qualified to testify in the field of occupant kinematics. The Defendant argues that the trial court erred in allowing Troopers Jamison Benefield and Paul S. Sanders to testify regarding occupant kinetics because neither witness had the necessary training and experience in occupant kinetics.[2] In response, the State contends that the trial court properly found that the troopers had specialized knowledge that would substantially assist the jury in understanding the evidence of the crash.

**Standard of Review.** Determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an abuse of that discretion. State v. Davidson, 509 S.W.3d 156, 208 (Tenn. 2016) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-264 (Tenn. 1997); State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W. 3d at 404-05 (citing Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

As part of its gatekeeping function, the trial court must first determine whether a proposed expert witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of his or her expertise. State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002). This determination hinges upon whether the proposed expert's qualifications authorize him or her to give an informed opinion upon the fact or issue for which his or her testimony is being proffered. Stevens, 78 S.W.3d at 834. The admission of expert proof is governed by Tennessee Rule of Evidence 702, which explains that a qualified expert witness "may testify in the form of an opinion or otherwise" if the expert has "scientific, technical, or other specialized knowledge [that] will substantially assist the

---

[2] We acknowledge the Defendant's reference to "occupant kinetics" throughout his brief and the Defendant's reference to "occupant kinematics" when citing to the testimony of the troopers because that is the terminology they used.

trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702; Payne v. CSX Transportation, Inc., 467 S.W.3d 413, 454 (Tenn. 2015). A court is, in essence, asking whether the witness is an expert, either through knowledge, skill, experience, training, or education, in the area in which he or she is providing testimony. Id.; Scott, 275 S.W.3d at 402. A court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." McDaniel, 955 S.W.2d at 265. Ultimately, "[t]he objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Brown v. Crown Equip. Corp., 181 S.W.3d 268, 275 (Tenn. 2005) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). If the expert testimony qualifies as admissible, the trial court's gatekeeping function is completed, as "[t]he weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." Payne, 467 S.W.3d at 455 (internal citations omitted).

Two cases are relevant to our disposition, State v. McCloud, 310 S.W.3d 851 (Tenn. Crim. App. 2009) and State v. Murphy, No. 15, 1990 WL 40995 (Tenn. Crim. App. Apr. 11, 1990). In State v. McCloud, the defendant's second offense driving under the influence (DUI) conviction stemmed from a single-car automobile accident involving the defendant and another person who had left the scene. 310 S.W.3d at 854-56. The defendant and the other person were intoxicated, in the same car at the time of the accident, and the primary issue of disputed fact at trial was the identity of the driver. Id. A law enforcement officer was permitted to opine as an expert in accident reconstruction that the defendant was the driver. Id. at 857. On appeal, the defendant argued the trial court erred in allowing the officer to testify as an expert witness on the issue of the position of the occupants of the vehicle during the crash or "occupant kinetics." Id. at 863. In affirming the trial court, this court determined that

> Initially, we note that it is not entirely clear whether the trial court allowed Officer Walker to offer his expert opinion that the defendant was the driver of the vehicle or to offer lay opinion that, based on his observations of the defendant's injuries, the defendant was the driver of the vehicle. As such, we will analyze each theory of admission in turn.
>
> . . . .
>
> Here, Officer Walker testified that he had been trained in accident investigation at the police academy and that he had taken further training in the investigation of fatal accidents, which he described as "more in-depth" than the police academy training. He stated that this training specifically

included training to discern the relative positions of the vehicle's occupants at the time of the accident. He also noted that he had investigated more than one hundred non-fatal accidents and 20 fatal accidents prior to the accident in this case. This training and experience, in our estimation, permitted him to testify as an expert witness regarding the mechanics of the accident in this case, particularly the movement of the car during the accident and the force applied to the car at the various points of impact. Furthermore, because Officer Walker testified that he had been trained to use the mechanics of the accident to determine the positions of occupants within the vehicle, the trial court properly determined that he was entitled to provide an expert opinion that the defendant was driving the vehicle at the time of the accident.

Id. at 864.

The McCloud court distinguished State v. Murphy, because the patrolman in Murphy did not testify that he had received particular training to surmise the position of the vehicle's occupants during the crash, which the court termed "occupant kinetics." Id. The court also rejected the defendant's argument that the officer was not qualified because he did not have a degree in physics or medicine, reasoning that "only 'a general grasp' of 'physics or mechanics, engineering or mathematics' is required." McCloud, 310 S.W.3d at 865 (quoting Murphy, 1990 WL 40995, at *4).

In Murphy, the defendant's vehicular homicide by intoxication conviction stemmed from a single-car automobile accident involving the defendant, who was black and wearing a hat, and another man, who was white, not wearing a hat, and died as a result of the injuries from the crash. 1990 WL 40995, at *1. Both men were intoxicated, in the same car at the time of the accident, and the primary issue of disputed fact at trial was the identity of the driver. Id. An officer was permitted to testify as an expert in accident reconstruction that the defendant was the driver. Id. The officer's background and experience included several years as a police officer, the last three having been spent in the traffic division, basic at-scene accident investigation, 120 hours of technical accident reconstruction, eighty hours of traffic accident reconstruction, and forty hours of traffic accident reconstruction supervision. Id. He attended a forty-hour course in micro-computer applications to traffic accident reconstruction, a forty-hour photography and traffic accident investigation course, and an advanced accident reconstruction seminar. Id.

On appeal, the defendant in Murphy conceded that the record supported the officer's qualifications as an expert in accident reconstruction. Id. at *2. However, the defendant asserted that the fields of accident reconstruction and occupant kinetics are different, and the officer's qualifications as an expert in "occupant kinetics-the science of the movement of bodies within a vehicle during an accident-were not sufficiently established." Id. at *3.

- 21 -

In determining that the trial court had erred in admitting the officer's testimony, the Murphy court stated the field of "occupant kinetics is a distinct specialty requiring training and experience that far exceed the requirements for accident reconstruction." Id. "[A]ccident reconstruction involves a determination of what happened to a vehicle immediately before, during, or after an accident-with emphasis on course, speed, and attitude. Occupant kinetics, as we use the term, is the determination of what happened to the persons (bodies) in the vehicle during the accident." Id. Because the officer's level of education and basic knowledge of the laws of physics or mechanics, engineering, or mathematics had not been established, the court determined the officer's testimony as to which occupant was the driver should have been excluded. Id. at *4. The court noted, "[w]e would expect, and indeed require, that an expert in occupant kinetics exhibit at least a general grasp of these subjects." Id.

We take this opportunity to observe that while occupant kinetics and occupant kinematics are related concepts, they are not the same. Occupant kinetics, also referred to as crash biomechanics, is the study of forces and their effects on occupants in a vehicle or building, particularly in terms of how those forces influence movement, injury, or behavior. Id. at *3 (noting that occupant kinetics is the determination of what happened to the persons (bodies) in the vehicle during the accident); Shwayder v. Cozad City Sch. Dist. No. 11, No. 21-CV-01680-MEH, 2022 WL 3568471, at *2 (D. Colo. June 13, 2022) (noting that few cases have discussed "occupant kinetics," although it appears fairly self-explanatory). Occupant kinetics involves analyzing how the human body moves during a collision and determining if reported injuries are consistent with the crash dynamics. Peralez v. Sung Man Cho, No. 12-97-00222-CV, 1998 WL 35270145, at *3 (Tex. App. Dec. 31, 1998) ("[O]ccupant kinetics [is] the effects of low impact collisions on the human body."). The expertise required for occupant kinetics includes knowledge of human anatomy, biomechanics, and the effects of forces on the human body during a crash. Id. at *2-3. On the other hand, occupant kinematics focuses on the motion of occupants without considering the forces that cause that motion. See Martindale v. Ripp, 629 N.W.2d 698, 713-14 (Wis. 2001) (quoting The American Heritage Dictionary of the English Language 992 (3d ed.1992)) (defining kinematics as "[t]he branch of mechanics that studies the motion of a body or a system of bodies without consideration given to its mass or the forces acting on it"). It analyzes the trajectory, speed, and position of occupants during movement. Id. The term "occupant kinematics" relates to the movement of an occupant's body in a situation. Id. In summary, kinetics deals with forces and their impact, while kinematics is concerned with the motion itself.

Occupant kinetics and occupant kinematics are specialized areas of expertise. They are distinct from accident reconstruction, which involves determining what happened to a vehicle immediately before, during, or after an accident, emphasizing course, speed, and attitude. The qualifications of an accident reconstruction expert typically include

- 22 -

specialized training and experience in evaluating physical evidence at crash scenes, as well as the application of principles of physics and mathematics. See e.g., Hood v. Leighty, 176 N.E.3d 212, 220, 226 (Ill. App. Ct. 2020). Accident reconstruction experts are typically permitted to offer testimony about the sequence of events immediately preceding an accident, including vehicle mass, direction of skid marks, dimensions of vehicles involved, dents, breaks, paint transfers, road surface textures, and physics principles such as inertia, velocity, and coefficients of friction. See Withrow v. Spears, 967 F. Supp.2d 982, 993 (D. Del. 2013). However, the issue of body placement in an accident falls squarely within the realm of biomechanics and an accident reconstruction expert is precluded from so testifying without establishing her qualifications in that field of expertise. See e.g., Snyder v. Harrington, No. 1:08 CV 1031, 2010 WL 4723483, at *3 (N.D. Ohio Nov. 15, 2010) (accident reconstruction experts are typically not permitted to offer opinions on the actual cause, existence or extent of a person's injuries); Burgett v. Troy-Bilt LLC, Civil No. 12–25–ART, 2013 WL 3566355, at *1, *4-5 (E.D. Ky. July 11, 2013) (holding that accident reconstruction expert could not offer certain opinions because he had no training in biomechanical analysis).

Turning to the facts of this case, during voir dire, Trooper Jamison Benefield of the Tennessee Highway Patrol Critical Incident Response Team (CIRT) testified that he had been in law enforcement for over twenty-five years and with CIRT for nine years. To be with CIRT, he received training in basic crash, advanced crash, crash reconstruction, and motorcycle reconstruction. As a crash data analyst, he received "CDR" training and forensic training through the National Forensic Academy as a certified crime scene technician. He received several hours of advanced training in reconstruction including utilizing event data recording (EDR). He served as an instructor for local departments in basic crash reconstruction and provided crash symposiums for live crash testing to observe how the motion was affected through the crash. Asked specifically what he meant by the motion "affected through the crash," he said he referred to the vehicle and the occupants of the vehicle to observe how they correlate together. Through the crash symposiums, he learned basic "subject matter on like occupant kinematics." He learned how ejections may occur as part of his training. He agreed that he was trained to take the physical evidence at a crash scene and "backtrack it in an ejection situation to figure out placement of occupants prior to the crash[.]" He had been involved with "several hundred" basic crash investigations, some of which involved ejections.

On cross-examination, Trooper Benefield agreed that he had never testified in court regarding ejections or occupant kinematics. He agreed that he had received "maybe four hours" of training in occupant kinematics. He had never received any classes on occupant kinematics and learned about the subject through his accident reconstruction courses. He was aware of published articles on occupant kinematics; however, the last article he had read was "several years ago." The last time he attended training regarding occupant

- 23 -

kinematics was in 2017 at a crash symposium. He had no training, education, or experience in accident reconstruction other than the courses provided by the Tennessee Highway Patrol. He had no training or experience in the amount of force required to eject a body from a vehicle. He believed he "touched on" the differences in size and weight of people and how their bodies – what force would be required to eject a larger person versus a smaller person from a vehicle at the symposium. After the State noted that Trooper Benefield corrected defense counsel on the appropriate terminology, defense counsel questioned Trooper Benefield's familiarity with State v. Murphy and State v. McCloud and the use of the phrase "occupant kinetics" by this court. Trooper Benefield was not aware of either case or the phrase occupant kinetics.

After extensive examination by the trial court and demonstrations concerning the crash, the court determined Trooper Benefield could testify as an expert in accident reconstruction. Although the court did not declare Trooper Benefield an expert in occupant kinematics, the court allowed Trooper Benefield to testify "as to what forces were on that car as it was spinning around." The court did not permit Trooper Benefield to testify "to the ultimate opinion [of who was the driver] because I think he's left some things out that could have been used for that. But I do think that he can testify as to the forces that are going on in that automobile . . . as it was making those rotations."

Although the trial court limited Trooper Benefield's expertise to the field of accident reconstruction, Trooper Benefield testified at trial that he observed the top of the passenger side door was folded down and opined, based on his prior crash experience, that this was consistent with the passenger being ejected. In contrast, he said the steering wheel and the center console would entangle the driver and that it was "very unlikely" that someone would be ejected out of the driver's side. He further opined that it would be more likely for the passenger to be ejected from the vehicle's passenger side than for the driver to be ejected from the vehicle's passenger side. Finally, he stated that it was "very unlikely" for the vehicle's driver to be ejected out of the passenger side and the passenger not to be ejected at all.

A. The Defendant contends that the qualifications and experience of Trooper Jamison Benefield are similar to the officer in Murphy, and the trial court erred in allowing Trooper Benefield to testify regarding occupant kinetics. Although this issue was vigorously contested at trial, the Defendant does not dispute the trial court's determination that Trooper Benefield was an expert in accident reconstruction, and the trial court did not explicitly qualify Trooper Benefield as an expert in occupant kinetics. In effect, the Defendant argues the trial court abused its discretion in allowing Trooper Benefield to testify as to the movement of the occupants during the collision. In support, the Defendant argues, among other things, that Trooper Benefield had received basic or partial training on occupant kinematics through courses or symposiums he had attended, that he had never

- 24 -

heard of the term occupant kinetics, that he did not know how many ejection cases he had worked in his career as a law enforcement officer, that he had never testified in court regarding an ejection case, that he had never been certified as an expert witness in occupant kinetics, and that he had only four hours of training specifically on occupant kinetics. In response, the State argues the record supports the trial court's determination that Trooper Benefield was qualified to testify about occupant kinetics. The State relies on Trooper Benefield's twenty-five years of law enforcement experience, and his assignment to THP's Critical Incident Response Team (CIRT) for almost nine years. The State further argues Trooper Benefield was qualified to testify about occupant kinematics because he participated in "crash symposiums," which involved live crash testing using "crash dummies" in vehicles to evaluate how they moved during a simulated crash. He explained that the live crash testing allowed him to learn how both the vehicle and the occupant "correlate together." It also involved "kinematics" where he studied "how [occupants] move inside the car whenever the car is involved in a crash" including how occupants are ejected from a vehicle.

Upon our review, we acknowledge that the trial court's ruling on this issue was less than a model of clarity. The court did not engage in the necessary framework to determine the admissibility of expert testimony. State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007), Scott, 275 S.W.3d at 401-02. Here, the parties did not dispute the location or cause of the accident in this case, and the primary fact issue in dispute was the identity of the driver of the vehicle. See State v. Bowman, 327 S.W.3d 69, 98 (Tenn. Crim. App. 2009) (parties stipulated to most of the elements of the offenses, and the only issue was whether the defendant was driving at the time of the accident). As such, the relevance of testimony from an accident reconstruction expert was marginal. See State v. Bonds, 502 S.W.3d 118, 141 (Tenn. Crim. App. 2016) ("Additionally, an expert witness's testimony must be relevant to the issues at trial."). Yet, the trial court qualified Trooper Benefield as an expert in accident reconstruction and allowed him to testify "as to what forces were on that car as it was spinning around" or "what forces were in play on whoever was in the driver's seat and what forces were in play on whoever was in the passenger seat and those would have affected that position or positioning." Trooper Benefield then testified that it was "very unlikely" that someone would be ejected out of the driver's side, that it would be more likely for the passenger to be ejected from the passenger side of the vehicle than the driver to be ejected from the passenger side of the vehicle, and that it was "very unlikely" for the driver of the vehicle to be ejected out of the passenger side but the passenger not to be ejected at all. Any reading of the substance of Trooper Benefield's testimony reveals that it falls squarely within the area of occupant kinematics. We recognize that areas of expertise may overlap, and our opinion is not intended to suggest that an expert in accident reconstruction may not also be qualified as an expert in occupant kinematics. However, the trial court expressly certified Trooper Benefield as an expert in accident reconstruction. The trial court's failure to acknowledge the distinction between occupant kinematics and

accident reconstruction in its ruling enabled Trooper Benefield to testify beyond the scope of accident reconstruction.

Although the trial court prohibited Trooper Benefield from testifying "to the ultimate opinion [of the driver's identity]," this did not insulate the court's ruling from error and further contributed to the confusion about the issue. Trooper Benefield testified regarding the forces that caused the passenger in the vehicle to be ejected, and the upshot of Trooper Benefield's testimony was that the victim-decedent was the passenger and not the driver of the vehicle. Accordingly, the trial court abused its discretion by conflating the expertise of occupant kinematics with accident reconstruction.

We further conclude that Trooper Benefield was not qualified to offer testimony regarding occupant kinematics or occupant kinetics. First, Trooper Benefield was at the crash scene to aid Trooper Sanders. Although Trooper Benefield had extensive expertise in accident reconstruction, he had only four hours of training in occupant kinematics. He had never heard of the term occupant kinetics. He could not identify any article he had read on occupant kinematics, and he last attended occupant kinematic training five years before trial. He had no classes or training in occupant kinematics in high school, technical school, or college, and he had no classes in physics or the amount of force required to eject a body from a vehicle. He had no training in mathematically calculating the forces exerted on a vehicle that is spinning after impact, and he had never done any mathematical calculations on a body being ejected from a vehicle. Trooper Benefield also did not review any medical records in this case or perform any calculations to determine where the Defendant and the decedent-victim were seated in the vehicle. Accordingly, we conclude that the trial court abused its discretion in allowing Trooper Benefield to testify as to the forces impacting the movement of the occupants in the vehicle at the time of the accident or occupant kinematics.

We must now determine the effect of the trial court's error in conflating accident reconstruction with occupant kinematics and permitting Trooper Benefield to testify beyond the scope of his expertise. Because the erroneous admission of evidence constitutes non-structural constitutional error, it is subject to harmless error analysis. "The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Additionally, "[w]here an error is not of a constitutional variety, Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Rodriguez, 254 S.W.3d at 372 (quoting Tenn. R. App. P. 36(b)). Appellate review "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. . . . the

crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." Id. at 372 (internal citations omitted).

The Defendant argues the error was not harmless because there was conflicting eyewitness testimony regarding who was driving the vehicle at the time of the accident. We disagree. The record shows that, earlier on the day of the crash, the Defendant was at the victim-decedent's home drinking beer and whisky. The victim-decedent was not drinking alcohol. The Defendant and the victim left her house around ten o'clock, and the Defendant was driving his vehicle. Shortly thereafter, the Defendant parked behind Domino's, and alcohol or beer bottles were recovered from the area after the accident. The jury heard two lengthy phone interviews during which the Defendant initially said that he could not remember anything about the crash, and upon reading the police report, he changed his memory of the event. During the second phone call, the Defendant vacillated regarding the circumstances leading up to the crash and claimed that the victim-decedent was driving and, before impact, jumped out of the vehicle. We acknowledge that one eyewitness testified that the woman was ejected from the driver's seat. However, two other eyewitnesses testified that the woman was ejected from or fell out of the passenger side. Holt, the sole eyewitness to the accident to observe the position of the occupants of the vehicle immediately before impact, testified that, when the Defendant's vehicle was coming toward her, she could see that a woman was in the passenger seat and a man was driving the vehicle. Additionally, the victim-decedent's shoe was found in the passenger floorboard of the defendant's vehicle, and the victim was wearing the matching shoe at the hospital. Based on this evidence, we conclude that the Defendant failed to establish that the erroneous admission of the testimony of Trooper Benefield more probably than not affected the verdict. Moreover, given the direct evidence that the Defendant was driving immediately before impact, we conclude that its erroneous admission had minimal if any impact on the jury's decision-making. Accordingly, the Defendant is not entitled to relief.

B. The Defendant next argues the trial court erred in admitting the testimony of Trooper Sanders regarding occupant kinetics. Although the Defendant concedes Trooper Sanders had more training in occupant kinetics than Trooper Benefield, he insists Trooper Sanders still lacked sufficient training and expertise to testify about occupant kinetics.

During voir dire, Trooper Sanders testified that he was employed with the Tennessee Highway Patrol for eighteen years and the CIRT for almost eight years. To be a member of CIRT one must be certified in crash reconstruction, which is 240 hours of training and three certifications. He had multiple training courses consisting of 550-600 hours of training. His training included education in physics and how vehicles move in a crash. He said his training about the way occupants move inside a vehicle was part of the curriculum he received to become an accident reconstructionist. However, he conceded that he had not been to a training course in occupant kinematics. He maintained that it was a subject

covered in his other training courses and that he received sixteen to twenty-four hours or two or three days of training in occupant kinematics. He had investigated at least a thousand crashes in general and with CIRT approximately 200. He had investigated ejection cases and explained that he dealt with the subject "frequently [in] determining occupant positions and ejections in any crash where . . . the patrol level is not able to establish it." He had previously been declared an expert twice in crash reconstruction and twice in "crash scene analysis and interpretation." He had never been declared an expert in occupant kinematics. Asked to explain his knowledge with regard to the physics of a crash and ejection cases, Trooper Sanders explained:

> The first thing that would come into play when you're trying to establish the locations of occupants in a crash is going to be, probably, Newton's first law of motion, the law of inertia. When you're moving in a vehicle, you're going to – just like the first law states, you're going to remain in motion, in that motion, until you're acted upon by an outside force.

> That's the first thing that we would use to put somebody back in any particular seat, working it backwards, and you would compare that with – the next thing we would do, we would look at any sort of transfer damage to the occupant, compare that with anything we see in the vehicle as far as the transfer of fabric or anything like that.

> But the bread and butter of it is going to be the law of inertia. And, I mean, all of the laws of motion, but mainly inertia in the big one for occupants.

Asked if he was able to establish what happened in the instant crash and who was located where, Trooper Sanders replied yes. He explained that his opinion was based on "the deceased was ejected from the passenger side of the vehicle through the passenger side window." He further came to his conclusion based on the following:

> The angle of the crash, when you look at the maximum engagement of the vehicles, the direction of travel of the vehicle approaching the collision, the occupants and everything, vehicle included, were traveling in a direction that would put the passenger side occupant continuing to travel towards the front half of the passenger side window.

> With the direction of force, the driver would have been directed more so towards the windshield, center console, and dash. In my opinion, it would be all but impossible for the driver to be ejected out of the passenger side window with the chain of events and the way that that crash unfolded.

. . . .

Well, not just the initial impact would push the passenger, the front right passenger, out but then also the rotation afterwards would also contribute to that passenger seat occupant going out that passenger side front window.

He testified further that it was standard procedure in a vehicle crash to do a general inspection of the vehicle which included seat belt usage, evidence of or against seat belt usage, examination of the tires for any visible damage, and anything that could be consistent with mechanical failure.

On cross-examination, Trooper Sanders testified that the last class he attended that covered occupant kinematics was in January. Although he could not recall how much of the class was dedicated to occupant kinematics, he conceded that it was not the majority of the class. He explained:

"[O]ccupant kinematics is a big part of crash scene analysis and reconstruction. . . . it's not fair to crash reconstruction to say that we're isolating just kinematics. Occupant kinematics is an aspect of crash reconstruction.

But that would be me trying to describe a puzzle with just one piece of it. We have . . . to do occupant kinematics you have to have principal direction of force. You have to put it all together.

So its hard to isolate just on doing occupant kinematics without getting into energy, which getting into principal direction of force, without getting into change in velocity. All of that would come into play in occupant kinematics. So, really, any time you're working on one part of it, you're kind of working on all of it.

Trooper Sanders agreed that he had never been certified as an expert in occupant kinematics and that he had never testified concerning his analysis of a crash scene in which the occupants were fully ejected. He agreed that he had not reviewed any medical records or the autopsy for the occupants of the vehicles in this case, and he agreed that such information may become necessary in certain cases. He agreed that he did not perform any mathematical calculations because this case was based "on physical evidence [rather] than any mathematical calculation as far as direction of travel." He said the "biggest" determination they made to determine occupant kinematics was the "maximum

engagement diagram." He clarified the difference between a full and partial reconstruction, and he explained that they will only document in a partial reconstruction case. In contrast, in full reconstruction cases, they will map the size of the scene. He agreed that the instant case was not a full reconstruction because they were requested only to diagram the scene and photograph and examine the vehicles. He did not conduct a delta-v calculation. He agreed that he had never testified as an expert regarding occupant ejection and that he had never testified as an expert in a civil deposition.

Following further questioning by the trial court, the trial court permitted Trooper Sanders to testify as an expert in accident reconstruction based on the following reasoning:

> I think I'm going to allow him to testify as to what the forces -- and I think that's what he said, he's basing whatever opinion he had based upon the forces that were on the automobiles and what impact that would have upon the occupants. Did not take into account the things that went on inside on that. So, again, I'm going to let him testify as to how those forces would have impacted someone in the passenger position and in the driver's position. I think that's -- I think that's fair.

Defense counsel renewed his objection and argued that accident reconstruction and occupant kinematics are two distinct fields based on State v. Murphy. He agreed the troopers were qualified to testify "about the energy exerted inside – both by the vehicle and inside the vehicle . . . . [And objected] relative to the testimony of how that energy would have affected those occupants."

For the reasons previously discussed, we conclude that the trial court erred in conflating the expertise of occupant kinematics with accident reconstruction. However, we further conclude the trial court's determination to admit Trooper Sanders's testimony regarding occupant kinematics or the movement of the occupants in the vehicle was proper. Trooper Sanders testified that he had "probably 16 hours, 24 hours," or "two or three days of training" in occupant kinematics. Although Trooper Sanders had no degree or college courses in physics, he was trained in occupant kinematics in a course he attended several months before trial. The Defendant takes issue with the extent of occupant kinematic training Trooper Sanders received by arguing that his training involved the use of data obtained from a 30-airbag control module, that no data from airbag control modules was obtained in this case, and that it had been about four years since Trooper Sanders attended any other training on occupant kinematics. In our view, Trooper Sanders testified regarding his extensive experience and understanding of occupant kinematics as outlined above. Moreover, he based his opinion on the physical evidence he observed at the crash scene. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the testimony of Trooper Sanders concerning occupant kinematics.

- 30 -

**2. Admissibility of Certified Copy of Driving Record.** The Defendant contends the trial court should have excluded the Defendant's driving record as proof of his prior DUI convictions because the Defendant was not provided a copy of his driving record at arraignment as required by Tennessee Code Annotated section 55-10-405(d). Because the State presented no other evidence of the Defendant's prior convictions, the Defendant argues he would not have been found guilty of aggravated vehicular homicide if the trial court had excluded the computer printout. The Defendant submits this court should reverse the trial court and remand the case for the Defendant to be re-sentenced for vehicular homicide. We agree with the Defendant that the State violated Section 55-10-405(d). However, because the statute is directory and does not provide a remedy, he is not entitled to relief. See State v. Haddon, 109 S.W.3d 382, 386 (Tenn. Crim. App. 2002).

The record reflects that before the jury returned its verdict, defense counsel advised the trial court that the Defendant was not provided with a certified copy of his driving record at arraignment as required by Tennessee Code Annotated section 55-10-405(d). After the jury returned the verdict, the trial court allowed additional argument and proof regarding the admissibility of the Defendant's driver's history. Travis Jones, an assistant public defender, testified that he represented the Defendant at his arraignment. Jones reviewed his digital case file, which included a discovery request. Jones was "unaware of any time in Maury County that the public defender's office has ever received discovery at arraignment." Regardless, his digital file did not contain a certified copy of the Defendant's driving record. Defense counsel then moved to exclude evidence of the Defendant's Department of Safety driver's record printout, which the State intended to introduce as evidence in phase two of this trial. Defense counsel argued the Defendant was not provided with a certified copy of the Defendant's driver's license as required by section 55-10-405(d), and the certified copy of the Defendant's driver's history was hearsay and violated the confrontation clause for not being able to confront the record keeper for the document.[3] The State argued, among other things, that the Defendant received a copy of his driver's record on November 27, 2018, and raising the issue after the verdict was prejudicial to the State. The trial court denied the Defendant's oral motion, reasoning that the Defendant had received a copy of his driving record well before trial and 55-10-405(d) was from a different section of the Code.

---

[3] The Defendant makes no hearsay or constitutional challenge in his brief on appeal, and these issues are waived. See also State v. Martinez, No. E2016-01401-CCA-R3-CD, 2017 WL 5613976, at *5 (Tenn. Crim. App. Nov. 21, 2017) (noting that official driver records fall within the public records hearsay exception and holding that the certification of a public record is not testimonial and therefore the use of the defendant's official driver record did not violate his rights under the Confrontation Clause).

In State v. Haddon, this court analyzed whether the State's failure to provide the Defendant with a copy of the department of safety printout at the arraignment as required by Tennessee Code Annotated section 55-10-403(g)(3)[4] required dismissal of the indictment. 109 S.W.3d at 384-85. This court held that the trial court erred in dismissing the portion of the indictment charging the defendant with second offense DUI. Id. at 384. We reasoned that the statute did not provide a remedy in the event the defendant did not receive a copy of the computer printout at the time of arraignment. Id. at 386. However, if a defendant contends that one or more of the listed prior convictions in the computer printout are in error, subsection (iii) of the statute provides relief. Id. at 385. Specifically, the defendant may move the court to require that a certified copy of the judgment of conviction be provided for the court's inspection, in order to determine the validity of the previous conviction prior to the computer printout being introduced as evidence. Id.

We further noted that the indictment, in compliance with Tennessee Code Annotated section 55-10-403(g)(2), alleged that the defendant had previously been convicted of DUI and that the defendant should have filed a motion requiring the State to produce a copy of the Department of Safety computer printout of his driver record when the document was not provided at the arraignment. If the defendant felt that the prior conviction was in error, he then could have filed a motion for the court to examine a certified copy of the judgment of conviction. Id. We considered the statute to be a condition precedent for the State to take advantage of subsection (i), which, at that time, allowed a copy of the official driver record maintained by the Department of Safety to be admissible as prima facie evidence of a prior conviction, notwithstanding other rules of evidence or laws to the contrary. Id. Failure of the State to produce a copy of the document to a defendant pre-trial would limit the use of the document as prima facie evidence of a prior conviction. Id. Finally, we concluded that there were insufficient grounds to justify dismissal of the indictment and that the language of Section 55-10-403(g)(3)(ii) was directory and not mandatory. Id. at 386.

---

[4] Prior to amendment, Section 55-10-403(g)(3) provided as follows:

(i) Notwithstanding any other rule of evidence or law to the contrary, in the prosecution of second or subsequent offenders under this chapter the official driver record maintained by the department and produced upon a certified computer printout shall constitute prima facie evidence of the prior conviction.

(ii) Following indictment by a grand jury, the defendant shall be given a copy of the department of safety printout at the time of arraignment. If the charge is by warrant, the defendant is entitled to a copy of the department printout at the defendant's first appearance in court or at least fourteen (14) days prior to a trial on the merits.

(iii) Upon motion properly made in writing alleging that one (1) or more prior convictions are in error and setting forth the error, the court may require that a certified copy of the judgment of conviction of such offense be provided for inspection by the court as to its validity prior to the department printout being introduced into evidence.

Following Haddon, the legislature amended Tenn. Code Ann. section 55-10-403(g)(3) (Supp. 2001) and excluded "shall" from the first sentence mandating that the official driver record constitutes prima facie evidence of a prior conviction. At the time of the offense in this case, section (d) provided as follows:

> A certified computer printout of the official driver record maintained by the department of safety constitutes prima facie evidence of a prior conviction of driving under the influence of an intoxicant, vehicular assault, aggravated vehicular assault, vehicular homicide, or aggravated vehicular homicide. Following indictment by a grand jury, the defendant shall be given a copy of the department of safety printout at the time of arraignment. If the charge is by warrant, the defendant is entitled to a copy of the department printout at the defendant's first appearance in court or at least fourteen (14) days prior to a trial on the merits. If the defendant alleges error in the driving record in a written motion, the court may require that a certified copy of the judgment be provided for inspection by the court as to validity prior to the introduction of the department printout into evidence.

Tenn. Code Ann. § 55-10-405(d). The statute contains "shall" in the second sentence and continues to require the Defendant to receive a copy of the department of safety printout at the time of arraignment.

Based on the same reasoning articulated in Haddon, we conclude that the Defendant is not entitled to relief. The indictment, in compliance with Tennessee Code Annotated section 39-13-213(a)(2) and Tennessee Code Annotated section 39-13-218, alleged that the Defendant had previously been convicted of four DUI's: on May 7, 2007, in Davidson County; on July 21, 2000, in Shelby County; on August 31, 1988, in Shelby County; and on March 5, 1987, in Shelby County. The Defendant has not challenged the accuracy of these convictions, nor did he file a motion requiring the State to produce a copy of the Department of Safety computer printout of his driver record when the document was not provided at the arraignment. Moreover, the statute does not provide a remedy for noncompliance, and "it is not the function of the judicial branch . . . to legislate by inserting penalty provisions into statutes where the legislature has chosen not to do so." Emory v. Memphis City Sch. Bd. of Educ., 514 S.W.3d 129, 145 (Tenn. 2017) (quoting Carter v. Duhe, 921 So.2d 963, 970 (La. 2006)).

**3. Sufficiency of the Evidence.** The Defendant also argues the evidence is insufficient to support his conviction based on the conflicting testimony from the eyewitnesses. Specifically, the Defendant points to the conflicting eyewitness testimony as to which side of the vehicle the victim-decedent was ejected from, where the Defendant

was seated immediately after the crash, and which way the 4-Runner spun upon impact. In response, the State contends the evidence is sufficient to support the Defendant's conviction. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. Vasques, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); see State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998); see State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. See Dorantes, 331 S.W.3d at 380-381.

Vehicular homicide is defined, in relevant part, as "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [t]he driver's intoxication, as set forth in [the DUI statute, § 55-10-401(a).]" Tenn. Code Ann. § 39-13-213(a)(2). "Intoxication," for purposes of DUI exists when a person is:

> [u]nder the influence of any intoxicant . . . that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess; [or the] blood alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08%) or more[.]

Id. § 55-10-401(1) (2013) (amended 2015). As relevant here, vehicular homicide is aggravated when the defendant has two or more prior DUI convictions at the time of the offense or when "[t]here was, at the time of the offense, twenty-hundredths of one percent (0.20%), or more, by weight of alcohol in the defendant's blood and the defendant has one (1) prior conviction for . . . [d]riving under the influence of an intoxicant[.]" Tenn. Code Ann. § 39-13-218(a)(1)(A), (a)(3)(A) (2016).

Viewing the evidence in the light most favorable to the State, the record shows the Defendant was drinking beer and whiskey around ten o'clock on the morning of the offense, and the victim-decedent was not. When he and the victim-decedent left her home, he was driving his 4Runner. Shortly before the crash, a worker at a Domino's pizza restaurant observed the Defendant's vehicle parked in their parking lot between ten and eleven o'clock that morning. The Defendant confirmed that he drove to Domino's that morning, and he claimed that he gave the keys to the victim-decedent because she was not inebriated, and he could not drive. Although the Defendant denied driving from Domino's, the worker said that when the vehicle left the parking lot, it "was like one fatal swoop" and traveling in the wrong direction of traffic. He further observed that the vehicle was "in a hurry," "going faster than they should have been going for that area," and failed to yield for a stop sign. After the crash, beer or alcohol bottles were recovered from the location where the 4Runner was parked. Several eyewitnesses saw the Defendant's vehicle traveling the wrong way into oncoming traffic. We acknowledge that one witness testified that the victim-decedent was ejected from the driver's side of the vehicle. However, two other eyewitnesses observed the victim-decedent being ejected from or falling out of the passenger side of the vehicle. Significantly, as one eyewitness saw the Defendant's vehicle coming toward her, she could see two occupants. She saw the victim was in the passenger seat, and she was certain a man was driving. The damage to the passenger side of the Defendant's vehicle was consistent with the victim-decedent being ejected from the passenger side, and there was no damage to the driver's side of the vehicle. The victim was found on the ground several feet from the passenger side of the Defendant's vehicle. The victim's shoe was found in the passenger floorboard, and the Defendant was found inside the vehicle with his feet toward the steering wheel.

Additionally, the jury heard the two phone calls the Defendant initiated with Sergeant Thomson and rejected his theory of defense. While the Defendant said he did not remember the events of the crash in the first call, in the second call the Defendant claimed the victim-decedent was driving and jumped out of the vehicle immediately before the crash. Finally, the medical examiner noted that an hour before the victim-decedent's death, she had a blood alcohol concentration level of 0.056. There was no dispute that the Defendant's blood alcohol contained 0.227 grams of ethyl alcohol, which is more than sufficient to satisfy the element of intoxication for vehicular homicide as well as establish the State's aggravation theory for aggravated vehicular homicide. Based on the above evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant was driving at the time of the crash. Bowman, 327 S.W.3d at 98. Accordingly, the evidence is sufficient to support his conviction of aggravated vehicular homicide.

## CONCLUSION

In consideration of the record as a whole, we affirm the judgment of the trial court.

s/                    Camille                    R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE